UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                         :

THE CLOROX COMPANY,                 :     Civil Action No. _21-cv-6454_

             Plaintiff,         :

v.                          :     **COMPLAINT**

BYOPLANET INTERNATIONAL, LLC  :     **JURY TRIAL DEMANDED**

             Defendant.       :

---------------------------------------------------------x

## COMPLAINT

Plaintiff The Clorox Company ("Clorox"), brings this action against defendant ByoPlanet International, LLC ("ByoPlanet"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     Clorox brings this action because of ByoPlanet's serial failures to comply with its contractual obligations.  As explained below, ByoPlanet has taken several steps to undermine the parties' agreements and to enrich itself unfairly at Clorox's expense; ByoPlanet has also attempted to leverage its own breaches to extract additional concessions from Clorox—all with the improper goal of trying to rewrite the parties' contract after the fact, because ByoPlanet is evidently unhappy with the deal that it struck just last year.  Although Clorox has worked in good faith over the past several months to attempt to address ByoPlanet's purported (and largely manufactured) concerns and excuses, enough is enough.

2.     The parties' contractual relationship began in 2016.  The operative agreement—the Third Amended and Restated Strategic Alliance Agreement (as amended, the "Agreement")—is dated September 2020.  The parties entered that Agreement for the purpose of marketing and

selling products used for disinfection and sanitation. Those products consist of carts and backpacks, and related accessory products, equipped with electrostatic spray nozzles capable of sanitizing surfaces more efficiently than conventional sprayers and wipes. These products have been and continue to be essential tools in the fight to curb the spread of the COVID-19 virus. Clorox has sold them to schools, hospitals, big-box retail stores, sports stadiums, and similar institutions to ensure that the COVID-19 virus and other diseases do not linger on surfaces and cause infection.

3.       Since entering the Agreement last year, Clorox has invested millions of dollars and countless hours towards the success of the partnership. Meanwhile, ByoPlanet has apparently had a change of heart about the terms to which it agreed. Over the past few months, ByoPlanet has taken a number of actions that are evidently designed to force Clorox to restructure the parties' Agreement in material ways that would enrich ByoPlanet, at Clorox's expense, including:

- Holding millions of dollars of inventory hostage, even though Clorox already paid for it and the Agreement makes clear that Clorox owns title to that inventory; and

- Opportunistically refusing to sell products to Clorox at the parties' agreed-to price, and instead attempting to re-negotiate the parties' arrangement on the fly by demanding a *seven-fold* increase in per-unit prices, contrary to the express terms of the Agreement.

Simply put, by wrongfully withholding disinfectant and sanitation devices that Clorox's customers need, in the midst of a global pandemic, ByoPlanet is seeking to pressure Clorox into caving on ByoPlanet's extortionate demands and revisiting the terms of the Agreement.

4.       Although Clorox reserves the right to amend this Complaint to assert additional claims and to seek additional remedies premised on ByoPlanet's various breaches and other misconduct, this Complaint focuses for now on ByoPlanet's two clearest breaches to date.

5.     **First**, ByoPlanet defaulted on a $6 million loan that Clorox made on October 9, 2020 (the "Note"), as a means of furthering the partnership and facilitating ByoPlanet's production and delivery of the products that are the subject of the Agreement.  A true and correct copy of the Note is attached as Exhibit 1.

6.     In connection with the negotiation of and entry into the Agreement last year, ByoPlanet purported to have a need for cash to fund component parts necessary to build the devices at issue.  To that end, the $6 million Note was one of two loans that Clorox made to ByoPlanet in 2020 (the other was for $8 million).  The "Use of Proceeds" provision of the Note provides the funds may be used only to "fulfill demand for parts and components used to produce [ByoPlanet] devices, for similar costs arising from materials used in [ByoPlanet's] manufacturing processes and for general corporate and working capital purposes."  Ex. 1, § 1(b).  Because Clorox is ByoPlanet's primary customer, Clorox was prepared to loan these funds to ByoPlanet so that ByoPlanet could build the devices ordered by Clorox, to ensure no disruption in supply.  Critically, the Note states that if principal and interest are not paid when due, Clorox may retain any royalty payments or other amounts that it owes to ByoPlanet and apply those amounts to the overdue principal and interest.

7.     The Note matured on June 30, 2021.  Yet notwithstanding the loans, exclusivity payment, and other royalty/device payments that ByoPlanet received over the past 18 months, collectively totaling many tens of millions of dollars, ByoPlanet hasn't paid a penny of principal or interest on the Note—no doubt in part due to ByoPlanet's reckless spending after receiving the proceeds of the $6 million Note, which is alleged on information and belief.  Instead, ByoPlanet has taken the remarkable position that it owes Clorox *nothing* on the Note, and that Clorox now owes ByoPlanet millions of dollars because of a bogus "true up" on units that have already been

sold.  ByoPlanet is advancing the fiction that it can unilaterally and retroactively re-set the agreed-to contract price, which the Agreement expressly forbids, and then use the difference as a "true up" to offset the amount of principal and interest it owes Clorox under the Note.

8.    **Second**, ByoPlanet has breached the parties' contractual exclusivity arrangement for domestic sales.  Specifically, in connection with the Agreement, Clorox paid ByoPlanet millions of dollars up front for the exclusive right to market and distribute ByoPlanet's proprietary technology—including the carts and backpacks—domestically through the term of the Agreement.

9.    Clorox recently learned that ByoPlanet has been willfully breaching the exclusivity arrangement by running a "Clorox T360 Summer Sales Promotion" behind Clorox's back—ByoPlanet is marketing and selling refurbished units and parts directly to U.S. customers, cutting Clorox out of the loop.  Although discovery will reveal the full extent of this breach and the amount of damages that have resulted, for present purposes, it suffices to say that ByoPlanet's actions have seriously devalued Clorox's exclusivity rights, for which ByoPlanet was more than happy to accept millions of dollars last year.

10.    In sum, ByoPlanet's bad-faith actions are in clear breach of the Note and the Agreement.  Clorox brings this suit to exercise its remedies under the Note and Agreement for ByoPlanet's failure to pay principal and interest when due on June 30, 2021, and for violating the contractual exclusivity provisions for domestic sales.

## PARTIES

11.    Plaintiff Clorox is a Delaware Corporation with its principal offices in Oakland, California.

12.    Defendant ByoPlanet is a Florida limited liability company with its principal offices in Sunrise, Florida.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332, due to the complete diversity of the parties and because the amount in controversy exceeds $75,000.

14.     The Court has personal jurisdiction over ByoPlanet.  The Agreement provides that each party irrevocably accepts and submits to the exclusive jurisdiction of federal courts in New York, New York for actions based in any way or arising out of or in connection with the Agreement.

15.     This suit is based in part on ByoPlanet's breach of the Agreement—so it expressly arises out of and in connection with the Agreement.

16.     In addition, the Agreement contemplates promissory notes representing ByoPlanet's indebtedness to Clorox, and the Note expressly references the Agreement.  Clorox also issued the Note solely to ensure that ByoPlanet would have the funds necessary to fulfill its manufacturing and supply obligations under the Agreement.  Accordingly, the Note is a material part of the parties' overall contractual relationship set forth in the Agreement—and to the extent this suit seeks to enforce Clorox's rights and remedies under the Note, it necessarily arises out of, and in connection with, the Agreement.  Venue is proper in this District under 28 U.S.C. § 1391(c) because ByoPlanet does business in this District.  Among other things, Clorox sells, and ByoPlanet ships, products to customers in this District.  Also, the Agreement contains an enforceable forum-selection clause designating the federal courts in New York, New York as the venue for any action.

## FACTUAL ALLEGATIONS

17.     Clorox is an American global manufacturer and marketer of consumer and professional products.  Clorox products include the namesake Clorox bleach, Brita water filters,

Burt's Bees personal care products, Kingsford charcoal, Pine-Sol and S.O.S. cleaning products, and Liquid-Plumr drain cleaner, among others.

18.     Clorox has expertise in the marketing, distribution and sale of disinfection, sanitization, and cleaning products.

19.     ByoPlanet is a manufacturer of electrostatic spray equipment, which delivers disinfectant to surfaces.

## I.    **The Tully and Proton Electrostatic Sprayers**

20.     Conventional sprayers release a fine mist of disinfectant.  They are effective at cleaning easy-to-reach surfaces, but those using them must bend down and directly spray or wipe every surface that needs to be cleaned.  Electrostatic sprayers resolve this problem of physically taxing, time-consuming cleaning.  They apply a positive electrical charge to aerosols passing through the nozzle.  The positively charged disinfectant is attracted to negatively charged surfaces.  As a result, surfaces can be uniformly coated with disinfectant without the hassle of manual cleaning.

21.     Among the disinfection and sanitization products produced by ByoPlanet is the Project Tully Sprayer Unit (the "Tully device").

22.     The Tully device, marketed by Clorox as the Clorox® Total 360® Electrostatic Sprayer, uses innovative spray technology to clean surfaces in commercial facilities, particularly hard-to-reach places, by spreading a disinfecting chemical product developed by Clorox.

23.     ByoPlanet also manufactures the Proton sprayer unit, or Proton pack, which is marketed by Clorox as the Clorox® Total 360® ProPack Electrostatic Sprayer.  Proton devices are electrostatic sprayers used for spraying Clorox chemicals to the front, back, and sides of surfaces.  Proton packs can quickly disinfect hard-to-reach spaces that would be time-consuming

to clean manually.  Proton packs save users not only time and labor, but also cost, because they use 65% less solution than conventional sprayers.

## II.   The Clorox and ByoPlanet Relationship

24.   Clorox and ByoPlanet first entered into an agreement on October 6, 2016.  Under that original Strategic Alliance Agreement, Clorox obtained from ByoPlanet the exclusive right to market and distribute certain products in the United States, Canada, and Mexico.

25.   On December 18, 2017, Clorox and ByoPlanet amended their original agreement and entered into the Amended and Restated Strategic Alliance Agreement, whereby Clorox obtained from ByoPlanet, among other things, the exclusive rights to market and distribute certain products worldwide.

26.   On April 4, 2018, Clorox and ByoPlanet entered into the Second Amended and Restated Strategic Alliance Agreement, whereby Clorox and ByoPlanet agreed to share profits from the sale by Clorox of certain products in an agreed-upon territory.  The Second Amended and Restated Strategic Alliance Agreement was subsequently amended on May 1, 2018.

## III.   The Third Amended and Restated Strategic Alliance Agreement

27.   As a result of the COVID-19 pandemic, demand for disinfection, sanitization, and cleaning products soared.  Disinfection was understood to be an important tool to prevent the spread of infectious disease, and products like the Tully and Proton devices were seen as vital weapons in the fight against the novel coronavirus.

28.   On September 30, 2020, Clorox and ByoPlanet entered the Agreement.

29.   Pursuant to the Agreement, each party has exclusive rights to manufacture, market, distribute, and commercialize certain products within its respective territory and verticals, and each party agreed to make royalty payments to the other party based on the net sales of such products

within its territory for the term of the Agreement.  As relevant here, Clorox's territory includes the United States and certain other countries.

30.     Clorox also agreed to pay ByoPlanet millions of dollars up front in exchange for the exclusive right to market, distribute, and commercialize ByoPlanet's proprietary induction charge technology, which includes sprayer products including Tully devices, in the Clorox Territory during the term of the Agreement, and for the ability to manufacture or cause to be manufactured for sale within Clorox's territory sprayer products including the Tully device.

31.     Rather than having ByoPlanet ship the ordered quantity to Clorox each month, the parties agreed that ByoPlanet would pack, mark, and ship the Tully devices (and Proton packs) directly to Clorox customers.

32.     The Parties agreed that in any action to enforce the Agreement, the prevailing party is entitled to an award of attorneys' fees and costs.

## IV.     The Note

33.     In connection with the negotiation of and entry into the Agreement in 2020, ByoPlanet purported to have a need for cash to fund component parts necessary to build the Tully and Proton devices.  Clorox was ByoPlanet's primary customer, and Clorox needed to be confident that ByoPlanet would be able to build the devices that Clorox and its customers ordered. Accordingly, in the interest of furthering the parties' partnership and ensuring that ByoPlanet would be able to deliver on its contractual promises, Clorox agreed in 2020 to loan ByoPlanet a total of $14 million dollars, backed by two promissory notes.

34.     The first note, dated May 27, 2020, is for $8 million.  That note, as amended on October 1, 2020, matures on May 27, 2022.

35.     The second promissory note—the Note at issue here—is for $6 million.  It matured on June 30, 2021.  Interest accrues on the unpaid principal from June 30, 2021, at an annual rate of 7.5%.

36.     The "Use of Proceeds" provision of the Note provides the funds may be used only to "fulfill demand for parts and components used to produce [ByoPlanet] devices, for similar costs arising from materials used in [ByoPlanet's] manufacturing processes and for general corporate and working capital purposes."  Ex. 1, § 1(b).  In other words, the purpose of the Note was to ensure that Clorox would have no disruption in supply of the ByoPlanet devices that are the subject of the Agreement.

37.     The Note allows for royalty payments owed under the Agreement to be applied to past due principal or interest payments on the Note.  Specifically, under the terms of the Note, "Principal and any accrued by unpaid interest under this Note shall be due and payable on June 30, 2021. . . . If any principal or interest is not paid when due . . . , then [Clorox] shall be entitled to retain any royalty payments or other amounts owing by [Clorox] to [ByoPlanet] (the 'SAA Payments') pursuant to [the Agreement] and apply such SAA Payments to such Overdue Payments."  Ex. 1, § 1(a).

38.     ByoPlanet is liable for all of Clorox's costs and expenses, including reasonable attorneys' fees, to collect on the Note, per its terms.

**V.     Clorox Places a Multi-Million Dollar Order for Tully Devices from ByoPlanet, and ByoPlanet Agrees to Fulfill Orders from Clorox's Customers**

39.     On February 21, 2021, Clorox and ByoPlanet entered the First Addendum to the Third Amended and Restated Strategic Alliance Agreement (the "Addendum").  Among other things, the Addendum was a way for Clorox to invest further in the partnership by providing ByoPlanet with (even more) much-needed capital.

40.     Under the Addendum, Clorox agreed to pre-buy a certain amount of inventory—thousands of Tully devices—from ByoPlanet.  The Agreement makes clear that title to these pre-bought Tully devices transferred to Clorox as of February, 2021, when Clorox paid for them in full.

41.     Although Clorox acquired title to the pre-bought Tully devices upon payment, the parties agreed that ByoPlanet would store all those Tully devices at a Gainesville, Georgia warehouse facility operated by a third party, for the purpose of fulfilling purchase orders placed by Clorox customers for Tully devices.  Clorox agreed to pay ByoPlanet a monthly fee for warehousing expenses, while ByoPlanet assumed responsibility for ensuring the inventory was stored properly.

42.     ByoPlanet retained the obligation under the Addendum to fulfill purchase orders in accordance with the purchase order procedures set forth under the Agreement, including the obligation to arrange for shipment of products to Clorox customers.

**VI.     ByoPlanet Reneges and Refuses to Supply the Tully Devices to Clorox's Customers**

43.     Before and after entering the Agreement and Note, Clorox made considerable investments in its own infrastructure to support the ByoPlanet partnership—including investing millions of dollars to increase capacity to manufacture the Total 360® Disinfectant Cleaner to be used in the Tully and Proton sprayer devices.  Put differently, even beyond the amounts committed to ByoPlanet under the Agreement and Note, Clorox was putting its own additional money (and time) where its mouth was, ramping up to meet anticipated demand and to make the ByoPlanet partnership a success.  But things quickly started to go south.

44.     Just four months after entering into the Addendum, ByoPlanet breached its obligations under the Agreement to ship Tully devices to Clorox customers who ordered the device.

45.     As of July 6, 2021, there were orders for 141 Tully devices that remained unfilled. Those unfilled, outstanding orders include orders for Tully devices slated to be shipped to hospitals and healthcare facilities, retirement communities, public schools, a head-start program for young children, a residential school for children with special needs, a university, and a Boys & Girls Club.

46.     On information and belief, ByoPlanet wrongly refused to supply these Tully devices to Clorox's customers as a means of exerting leverage over Clorox in the parties' other disputes—particularly the dispute over the Note.  Although Clorox was ultimately able to contract directly with ByoPlanet's outside service provider to resume shipment of the Tully devices to Clorox customers as of July 9, 2021, ByoPlanet's material disruption in supply had no legitimate business purpose, and was instead a bad-faith negotiating tactic intended to force Clorox to capitulate on ByoPlanet's other unreasonable and extra-contractual demands.

## VII.   ByoPlanet Refuses to Supply Proton Packs at the Price Agreed by the Parties

47.     Under the Agreement, the parties could also agree to add additional products and agree on a per-unit transfer price—which the parties did a few months later with respect to the Proton packs.

48.     Specifically, when the parties executed their Agreement in September 2020, the Proton packs were not ready for commercial use, so the parties did not set a price for them at that time.

49.     The parties eventually agreed on a transfer price for Proton packs at a meeting held on or about February 22, 2021.  The participants in that meeting included Chris Vickers Tucker, the Vice President and General Manager of Clorox's Professional Products Division; Rob Mirabella, then-Senior Director and Leader of the Office of Alliances at Clorox; and Peter Johansson, the President and Chief Operating Officer at ByoPlanet.

50.     After that meeting, ByoPlanet repeatedly invoiced Clorox for Proton packs at the agreed transfer price.

51.     The Agreement specifies the exclusive way the transfer price can be changed:  Only once per year, and only with written notice at least 60 days in advance, together with calculations showing in reasonable detail how the new transfer price was calculated.

52.     Because the transfer price for Proton packs was set in February 2021, the Agreement does not allow the parties to change that price until the next contract year, which commences on January 1, 2022.  And neither party has provided the other of written notice of a proposed change for the next contract year, with or without calculations showing how the new proposed price was calculated.  For the avoidance of doubt, even if there had been notice of a proposed change (there hasn't), that proposed change would apply only to Proton packs ordered in the *next* contract year—not to anything previously ordered.

53.     Nonetheless, after months of fulfilling orders for Proton packs at the agreed transfer price set in February 2021, ByoPlanet purported to unilaterally implement immediate prospective and retroactive price increases on all Proton packs.

54.     Specifically, starting in May or June 2021, ByoPlanet started claiming that it deserved as much as *seven times* more than the per-unit cost agreed by the parties.  And that's not just for Proton packs yet to be sold, but for the approximately 2,000 packs *already* sold.

12

55.     The timing of ByoPlanet's maneuver was no coincidence—ByoPlanet knew that the Note would be maturing in a matter of weeks, with millions of dollars in principal and interest due to Clorox by the end of June 2021.  ByoPlanet was attempting to orchestrate a scenario where, instead of it owing money to Clorox, Clorox would owe money to ByoPlanet.  ByoPlanet's main tactic was to manufacture a supposed "true up" payment that Clorox would supposedly owe on the Proton packs already sold, to offset the amounts that would imminently be due to Clorox under the Note.

56.     ByoPlanet presented various rationales for this price increase at different points in time, including that Clorox had reduced its sale projections as the nation gradually began to emerge from the pandemic and demand for spray devices moderated.  Significantly, though, the parties agreed that Clorox's projections were not binding, and the process that ByoPlanet promised to use for reassessing its costs does not allow it to increase prices mid-year in reaction to changes in sales projections.

57.     Chuck Gilstrap, ByoPlanet's Chief Financial Officer, sent an email to Haydn Wilson, Clorox's Director of Finance, at 2:55 PM on June 18, 2021, in which he wrote that because of "a substantial decline in forecasted Proton units," ByoPlanet would "need[] to adjust the transfer price" upwards to nearly *double* the price agreed by the parties in February 2021.  Mr. Gilstrap claimed that "[t]his increase is mainly driven by the significant rise in international shipping that was not built into our original pricing."  He also cited "labor inefficiencies and amortization of certain costs over a lesser volume" of Proton packs.  Remarkably, Mr. Gilstrap wrote that the increased price would apply not only to future orders of Proton packs, but also to the "~1,500 units already shipped."  He promised to "send a 'true-up' invoice for the difference within the next week."

58.     The next day, at 3:17 PM, and before Clorox had responded to his first email, Mr. Gilstrap sent a follow-up email to Mr. Wilson.  He confirmed that ByoPlanet was "in receipt of Clorox's proposed order of 5,000 Proton devices."  But now, the per-unit transfer price would not be the price agreed in February 2021, or even the massive two-fold increase he had threatened the previous day.  Now it would be close to *triple* the agreed price.  And on top of that, Mr. Gilstrap stated that "Clorox is also obligated to pay a true-up on the 1,985 previously purchased units for the difference between the [new price] and the previously paid price [that the parties had agreed to in February 2021]."  Mr. Gilstrap clarified that the retroactive per-unit price would hold only if Clorox committed to its 5,000-unit order:  "Should you chose not to place the above mentioned order, the Transfer Price of the previously purchased units (1,985) will be adjusted to" over *seven times* the agreed price!  This email, sent on Saturday, June 19, 2021, concluded: "Please let us know by Wednesday, June 23, 2021 if you will be placing the 5,000 unit [order].  Otherwise, we will proceed with the invoicing for the revised Transfer Price."

59.     Clorox responded to ByoPlanet's outrageous demands on July 1, 2021, in the form of an email from Jeff Brown, Vice President of Corporate Development at Clorox, to a ByoPlanet representative.  Mr. Brown explained that "the [Agreement] provides the method for fixing the transfer prices for the products under the agreement.  As Chuck acknowledged in his emails, the parties expressly aligned on a transfer price . . . per unit for the Proton sprayers and all units sold to date have been invoiced at such agreed transfer price."  Mr. Brown further stated that, "[u]pon agreement regarding the transfer price, the [Agreement] expressly provides that [ByoPlanet] shall invoice Clorox only the applicable transfer price.  Furthermore, the contract provides for an express provision regarding how and when the transfer price can be changed," and "[o]utside of the circumstances contemplated in that provision," wrote Mr. Brown, ByoPlanet "has no right to

unilaterally change the transfer prices for any products, and we read the contract to unambiguously provide that [ByoPlanet] is required to supply products at the then-applicable transfer prices to the extent ordered, in accordance with the terms of the [A]greement. We have and will continue to place our orders in accordance with the contract and respectfully request that [ByoPlanet] continue to comply with its obligations under the [A]greement."

60.     Even though ByoPlanet promised in the Agreement to supply products to Clorox sufficiently to meet market demands and to accept and process purchase orders when placed, ByoPlanet has not complied with its obligations. Instead, ByoPlanet has selectively decided when to process orders and when to hold the Proton packs hostage in an effort to force Clorox to pay a transfer price much higher than the one agreed by the parties—not just for open and future orders, but also for orders that have already been fulfilled and paid for. As explained above, ByoPlanet's main goal in retroactively increasing the transfer price on prior orders was to create a "true up" payment that would be due from Clorox, as a means of avoiding payment of principal and interest due on the Note.

**VIII.    ByoPlanet Fails to Repay The Note, Which Matured on June 30, 2021**

61.     The Note matured on June 30, 2021, with interest accruing at an annual rate of 7.5%.

62.     As explained above, the Note provides that if principal or interest are not paid when due on June 30, 2021, Clorox is entitled to retain any royalty payments or other amounts that it owes to ByoPlanet under the Agreement and to apply those payments to ByoPlanet's overdue payments on the Note.

63.     On July 1, 2021, Jeff Brown, Vice President Corporate Development at Clorox, e-mailed a ByoPlanet representative, noting that "our $6 million promissory note matured yesterday and is now accruing interest."

64.     On July 2, 2021, ByoPlanet responded, stating that "ByoPlanet respectfully disagrees with Clorox's assertions relating to . . . the $6M promissory note."

65.     On July 5, 2021, ByoPlanet again wrote to Clorox, revealing the real reason for its attempt to dramatically—in breach of the Agreement—increase the transfer price retroactively for the Proton devices.   Namely, ByoPlanet was making a last-ditch effort to avoid paying the $6 million principal plus interest on the Note that had matured a few days earlier.  ByoPlanet stated its "position" that "an appropriate true-up on units sold to date not only offsets the $6M loan repayment, but creates a significant payment due to ByoPlanet."

66.     ByoPlanet's desperate maneuver was not just bad faith, it was a breach of the parties' Note (and the Agreement).

67.     Starting in early July, Clorox demanded repayment of the Note.  ByoPlanet has failed to do so, and has indicated that it refuses to make good on the Note.  In other words, notwithstanding the loans, exclusivity payment and other royalty/device payments that ByoPlanet has received in the past 18 months, which, on information and belief, total many tens of millions of dollars, ByoPlanet hasn't paid a penny of principal or interest on the Note.

## IX.     ByoPlanet Breaches the Agreement's Exclusivity Provisions

68.     As explained above, pursuant to the Agreement, Clorox paid ByoPlanet millions of dollars up front for the exclusive right to market and sell the Tully and Proton devices domestically through the term of the Agreement.

69.     However, ByoPlanet has been actively breaching the Agreement and violating Clorox's contractual exclusivity rights.  Clorox recently learned that ByoPlanet has been running a domestic sales promotion—which ByoPlanet calls its "Clorox T360 Summer Sales Promotion"—in which ByoPlanet is undercutting Clorox by selling refurbished units and parts directly to U.S. customers.

70.     Discovery will reveal the full extent of ByoPlanet's breach, the breadth of its marketing campaign, and the number of units that ByoPlanet sold in breach of the Agreement.  But it is already clear that ByoPlanet's actions have seriously harmed the value of Clorox's exclusivity rights, for which Clorox paid ByoPlanet millions of dollars last year—and ByoPlanet's ongoing misconduct threatens to harm Clorox further in the future.  Among other things, Clorox's brokers, distributors, and customers rely on Clorox's assurances that it has the exclusive right to sell the devices, so ByoPlanet's breaches have damaged Clorox's credibility and thus harmed its business, brand, and reputation.  And in addition to lost sales on the devices themselves, Clorox stands to lose potential future revenue streams associated with chemistry sales on each unit that ByoPlanet sold in violation of the Agreement.

71.     This wasn't the first such violation:  On information and belief, there have been at least two prior instances where ByoPlanet breached the parties' exclusivity arrangement by selling or donating devices to U.S. customers.

72.     On information and belief, ByoPlanet has also failed to take the necessary steps to protect its own intellectual property rights with respect to the Tully and Proton devices and ByoPlanet's proprietary technology.  This failure has further devalued Clorox's contractual exclusivity rights, a fundamental premise of which is that third parties would not be able to rely on ByoPlanet's technology to market and sell similar devices.

**X.**   <u>**ByoPlanet's Other Missteps and Bad-Faith Actions**</u>

73.   Notwithstanding ByoPlanet's various missteps and violations of the parties' agreements, Clorox has bent over backwards to try to accommodate ByoPlanet's purported concerns and to try to make this relationship work.  And as described above, Clorox has invested millions of dollars and countless hours to ramp up capacity to meet anticipated demand, all with the goal of making the Tully and Proton devices a success—which would benefit ByoPlanet as well as Clorox.  But ByoPlanet has made this effort extremely difficult due to a pattern of misconduct that has only escalated in recent months.  Ultimately, ByoPlanet has materially undermined the parties' prospects for a successful partnership on the Tully devices or Proton devices.  Beyond the issues described above, here are a couple of other examples.

74.   On information and belief, shortly after Clorox loaned ByoPlanet $6 million last fall, ByoPlanet recklessly spent millions of dollars, some of which was used to acquire an interest in a private plane.  This short-sighted spending spree further deteriorated ByoPlanet's financial condition and ultimately put ByoPlanet in a position where it resorted to the various machinations (as described in this Complaint) designed to avoid repayment of the Note and to force Clorox to revisit other agreed-to contract terms.

75.   ByoPlanet also repeatedly pushed back the date (by several months) by which the Proton devices were supposed to be ready for sale and distribution—costing the parties critical time in the middle of the COVID-19 pandemic, when the devices were expected to be instrumental in the fight against the novel Coronavirus.  Then, in early 2021, ByoPlanet supplied non-compliant "demo" Proton devices that hampered Clorox's ability to generate pre-launch demand from its current and prospective customer base—i.e., fully compliant demo devices would have allowed Clorox to let its bigger customers see and use the Proton devices in person, and to pre-order them

based on that experience, but ByoPlanet's mistakes cost the parties key time in generating pre-launch demand.

76.    In short, Clorox has done everything in its power to make this relationship a success, but ByoPlanet has made things extremely difficult by a series of actions designed to benefit itself, at Clorox's expense, notwithstanding the express terms of the deal the parties struck late last year.  It is now apparent that even though the parties' deal was negotiated and executed by sophisticated business people with the assistance of experienced counsel, ByoPlanet is having second thoughts and is looking for a way out.

## COUNT I
### (Breach of Promissory Note)

77.    Clorox repeats and re-alleges each and every allegation of Paragraphs 1 through 76 of this Complaint as though set forth herein.

78.    The Note is a valid contractual instrument governed by the laws of California.  The Agreement—of which the Note is an integral part—is a valid contractual instrument governed by the laws of New York.

79.    Clorox has performed all of its obligations under the Note.

80.    The Note matured on June 30, 2021.

81.    To date, ByoPlanet has not repaid the principal or accrued but unpaid interest due and payable on the Note.

82.    Accordingly, ByoPlanet has breached its obligations under the Note.

83.    As a direct and proximate result of ByoPlanet's breach of the Note, Clorox has suffered injury and is entitled to damages in an amount to be determined at trial.  Clorox is also entitled to all costs and expenses (including court costs and reasonable attorneys' fees) incurred in the enforcement or preservation of its rights, including, but not limited to, in this action.

## COUNT II
### (Breach of Agreement)

84.     Clorox repeats and re-alleges each and every allegation of Paragraphs 1 through 83 of this Complaint as though set forth herein.

85.     The Agreement is a valid contractual instrument governed by the laws of New York.

86.     Clorox has performed all of its obligations under the Agreement.

87.     Pursuant to the Agreement, Clorox paid ByoPlanet millions of dollars up-front in exchange for the exclusive right to market and sell the Tully and Proton devices within the United States and other countries.

88.     ByoPlanet has breached the Agreement's exclusivity provisions by, among other things, running a marketing and sales campaign for refurbished units and parts directly to U.S. customers.

89.     As a direct and proximate result of ByoPlanet's breach of the Agreement, Clorox has suffered injury and is entitled to an injunction against further breaches, and/or damages in an amount to be determined at trial.  The full extent of ByoPlanet's breach—and the damages resulting from the breach—is presently unknown but will be revealed in discovery.  Nonetheless, ByoPlanet's breach of the exclusivity provision in the Agreement has already harmed Clorox, and threatens to harm it further in the future, due to lost sales, loss of potential revenue on chemistry, and damage to Clorox's brand and reputation.

90.     Due to the nature of ByoPlanet's ongoing breach, it threatens irreparable harm to Clorox, such that damages would not be a fully adequate remedy.

91.     Clorox is also entitled to all costs and expenses (including court costs and reasonable attorneys' fees) incurred in the enforcement or preservation of its rights, including, but not limited to, in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Clorox respectfully requests judgment against ByoPlanet be entered as follows:

a.     An order and judgment in favor of Clorox and against ByoPlanet on the Note for $6 million, together with interest from June 30, 2021.

b.     An injunction and judgment against ByoPlanet preventing it from further breaching the Agreement, and/or an order and judgment awarding damages in favor of Clorox and against ByoPlanet under the Agreement in an amount to be proven at trial.

c.     All costs, fees and other expenses associated with this action, including reasonable attorneys' fees, which are expressly authorized by the Note and Agreement.

d.     Awarding such other legal or equitable relief as this Court deems just and proper.

Dated: July 29, 2021                    Respectfully submitted,


                                        */s/ Zainab N. Ahmad*
                                        Zainab N. Ahmad
                                        Alexandra Perloff-Giles
                                        Laura F. Erstad
                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        Telephone: 212.351.4000
                                        E-mail: ZAhmad@gibsondunn.com
                                        E-mail: APerloff-Giles@gibsondunn.com
                                        Email: LErstad@gibsondunn.com


                                        Theane Evangelis (*pro hac vice* application
                                        forthcoming)
                                        Kahn Scolnick (*pro hac vice* application
                                        forthcoming)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        333 S. Grand Avenue
                                        Los Angeles, CA 90071
                                        Telephone: 213.229.7000
                                        E-mail: TEvangelis@gibsondunn.com
                                        E-mail: KScolnick@gibsondunn.com


                                        *Counsel for Plaintiff The Clorox Company*